IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| X-CALIBER FUNDING LLC, as servicer for U.S. BANK, N.A., as trustee of the XCAL 2019-IL-1 MORTGAGE TRUST,<br><br>Plaintiff,<br><br>v.<br><br>MARK B. PETERSEN,<br><br>Defendant. | Civil Action No.: 1:24-cv-05529 (VM)(BCM) |
| MARK B. PETERSEN,<br><br>Third-Party Plaintiff,<br><br>v.<br><br>JOSEPH C. TUTERA, WALNUT CREEK MANAGEMENT, L.L.C., and ILLINOIS DEBT ACQUISITION COMPANY, L.L.C.<br><br>Third-Party Defendants. | |

## DEFENDANT MARK B. PETERSEN'S COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Defendant, Counterclaim-Plaintiff and Third-Party Plaintiff, Mark B. Petersen ("Defendant" or "Petersen"), by and through his attorneys, Saul Ewing LLP, brings these counterclaims against Plaintiff X-Caliber Funding LLC, as servicer for U.S. Bank, N.A., a trustee of the XCAL 2019-IL-1 Mortgage Trust ("Plaintiff" or "X-Caliber") and third-party claims against Joseph C. Tutera ("Tutera"), Walnut Creek Management Company, L.L.C. ("Walnut Creek") and

Illinois Debt Acquisition Company, L.L.C. ("IDAC") (collectively, "Third-Party Defendants"), and alleges as follows:

## NATURE OF CASE

1. X-Caliber and Joseph Tutera's entities, Walnut Creek and IDAC, have orchestrated a scheme to take advantage of Petersen's months-long hospitalization from life-threatening liver failure, as well as a ransomware attack against several of his assisted living facilities, to collect a windfall by mismanaging and devaluing certain collateralized assisted living facilities, while enforcing a personal guaranty against Petersen.

2. X-Caliber provided a $40 million loan to ten (10) Petersen Health Care assisted living facilities (the "Facilities"), in return for, among other things, liens on all assets of those facilities, as well as a personal guaranty by Petersen. After several of the facilities fell victim to a ransomware attack that disabled their billing and payroll systems, X-Caliber opportunistically declared default and accelerated the entire debt, though there were no missed debt payments.

3. While Petersen focused on his survival in an Arizona hospital and hoped to qualify for a liver transplant, X-Caliber had a federal court in Illinois install a receiver over most of the Facilities—and had the United States Bankruptcy Court for the District of Delaware keep those Facilities out of a separate Petersen-related bankruptcy—by promising to fund any operating shortfalls, install competent management over the Facilities and to ensure the Facilities' values would be maximized for creditors.

4. These assurances were false. Instead, X-Caliber's selected receiver and management company, Walnut Creek, have run the facilities into the ground, have coordinated with X-Caliber to take actions that devalue the Facilities and have increased Petersen's total exposure on the personal guaranty.

53154582.3

5. Walnut Creek, is run by Tutera, who was previously accused in a qui tam lawsuit brought on behalf of the United States and 11 (eleven) states of engaging in a kickback scheme. Tutera is a long-time direct competitor of Petersen in the Illinois assisted living industry and has taken his newfound role managing the Facilities as an opportunity to ruin his rival and enrich himself. He is even actively removing residents from the Facilities to other Tutera-owned assisted living homes.

6. Recently, X-Caliber assigned all debt under the Loan Agreement to IDAC, an entity organized by Tutera and whose registered agent is Michael F. Flanagan, the appointed receiver. Tutera is now able to foreclose and keep all of the Facilities for his own benefit and at a bargain price since Walnut Creek has spent months devaluing the Facilities.

7. As part of the scheme, however, Tutera assigned back to X-Caliber all rights under the Guaranty, so that X-Caliber can take advantage of Petersen's growing (and calculated) exposure to maximize profits for its investors. This obvious orchestration, self-dealing and bad faith should not be rewarded or confirmed by the Court and, instead, damages should be awarded to Petersen in an amount to be determined at trial.

## PARTIES

8. Defendant Mark B. Petersen is an individual who is a citizen of the State of Illinois.

9. Plaintiff X-Caliber Funding LLC is a limited liability company established under the laws of the State of New York, whose members are all citizens of New York.

10. Joseph C. Tutera is an individual who is a citizen of the State of Kansas. Upon information and belief, he is the managing member of Walnut Creek Management Company, L.L.C.

53154582.3

11. Walnut Creek Management Company L.L.C., is a Missouri limited liability company with its principal place of business in Kansas City, Missouri. Upon information and belief, its sole member is Tutera who is a resident of Kansas.

12. Illinois Debt Acquisition Company, L.L.C., is a Missouri limited liability company with its principal place of business in Kansas City, Missouri. Upon information and belief, its sole member is Tutera who is a resident of Kansas.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1332 and 1441 on the grounds of diversity of citizenship, as this matter is between "citizens of a State and citizens or subjects of a foreign state," and the amount in controversy exceeds $75,000.

14. This Court also has supplemental jurisdiction over these counterclaims pursuant to 28 U.S.C. § 1367, because the counterclaims are "so related to the claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution."

15. Venue is proper in this District pursuant to 28 U.S.C. §§ 1391(b) and 1441(a) because the New York Supreme Court, where Plaintiff originally filed its action against Defendant, is located within the United State District Court for the Southern District of New York. Moreover, venue is proper in the United States District Court for the Southern District of New York because Plaintiff and Defendant contractually consented to the jurisdiction of the courts of the City, County, and State of New York.

53154582.3

## **RELEVANT FACTS**

## **BACKGROUND ON PETERSEN AND PETERSEN HEALTH CARE**

16. Petersen currently serves as the Chief Executive Officer of Petersen Health Care ("PHC"), which was one of the country's leading long-term care provider and the largest chain of nursing homes and assisted, independent and supportive residential living communities in Illinois. PHC and its affiliates provided critical care to elderly citizens throughout the Midwest.

17. The company was formed in 1974 by Petersen's father and uncle, and remained family-owned providing various healthcare and rehabilitation services for elderly citizens in Illinois, Missouri, and Iowa in partnership with physicians, skilled nurses, and other health care providers in order to provide assisted and supportive living, skilled care, respite care, memory care,, hospice, local medical transportation, radiology and pharmacy services.

18. PHC provides quality care that focuses on its residents and in creating strong ties to the local communities it serves. PHC serves small rural communities and continues to provide care for Medicaid eligible seniors when many providers do not. In many cases, PHC is the largest employer in the respective geographic area and has always emphasized integration intothe community and maintaining a strong community presence. PHC's focus has always been "caring with a hometown touch."

19. Petersen grew up around PHC and had the opportunity to serve on the staff in a variety of positions, learning about the company, its employees, and residents from the ground up.

20. In 2002, Petersen became the CEO with the aim of expanding PHC throughout the United States in order to provide high quality care to a large number of communities. Though PHC began with just two homes in Illinois, it grew into a major force in long-term care, with more than 100 facilities at one point in time.

21. As CEO, Petersen led the acquisition of a number of long-term care facilities and other properties that were intended to be converted into long-term care facilities for the elderly. By the end of 2023, PHC controlled over 90 nursing homes containing over 6,796 beds and had an annual operating revenue exceeding $339.7 million. PHC employs nearly 4000 employees and is recognized as a major community partner in 43 communities throughout Illinois, eastern Iowa and Missouri.

**X-Caliber's Bridge Loan**

22. In and around October 31, 2019, X-Caliber issued a loan (the "Loan") to ten separate Petersen-affiliated facilities (the "Facilities") and their operating companies in the amount of $40,000,000, pursuant to the terms and conditions of the October 31, 2019, Loan Agreement ("Loan Agreement").[1]

23. Specifically, the Loan Agreement was between X-Caliber and El Paso HCC, LLC; Flanagan HCC, LLC; Kewanee AL, LLC; Knoxville AL, LLC; Legacy Estates AL, LLC; Marigold HCC LLC; Monmouth AL LLC and Polo LLC, which are owners of the property on which El Paso HCO, LLC; Flanagan HCO, LLC; CYE Kewanee HCO, LLC; CYE Knoxville HCO, LLC; Legacy HCO, LLC; Marigold HCO, LLC; CYE Monmouth HCO LLC and Polo HCO, LLC (collectively, the "Borrowers") operate skilled nursing and assisted living facilities.

24. In return, X-Caliber became, among other things, the Borrowers' senior secured creditor with liens on all of their assets, including accounts receivable and real estate.

---

[1] The Initial Loan Agreement was subsequently amended on or about February 24, 2021, to adjust the collateral subject to the Loan. It was then subsequently amended on November 6, 2022, and November 13, 2023. For purposes of these motion papers, the subsequent amendments did not materially impact the relevant terms of the Loan Agreement.

25. The parties understood that the Loan was intended to be a bridge loan until the U.S. Department of Housing and Urban Development ("HUD") determined it would provide financing for each of the Facilities. HUD reviews applications on an individual basis, so the Loan from X-Caliber was necessary to provide a financing bridge until HUD completed its review and approved each of the Facilities.

26. The Facilities were some of the premier long-term care facilities in the PHC Care portfolio, were relatively new facilities, and were believed by PHC and X-Caliber as the most qualified and most likely to be accepted by HUD.

27. X-Caliber expressly chose to provide the Loan based on the Facilities' premier condition.

28. In addition to the Loan Agreement, Petersen signed a personal guaranty for the Loan owed by Borrowers to X-Caliber (the "Guaranty").

29. Petersen and X-Caliber both understood that the value of the Facilities were far greater than the Loan. Petersen never would have signed the Guaranty had he believed the Loan was not over-collateralized, or there was any risk the Facilities were not of far greater value than the Loan.

**Petersen's Personal Health Issues**

30. In the fall of 2023, Petersen was diagnosed with cirrhosis of the liver, which took a very aggressive form. By November 2023, Petersen was hospitalized in Arizona and told he had very little time left to live without a liver transplant.

31. As a result, Petersen had little time to focus on PHC, since he was focused on his health, family and survival. Petersen had little knowledge, much less involvement, in any of the

53154582.3

events that occurred in late 2023 and early 2024, and, instead, relied on PHC's staff and attorneys to make decisions in that time period.

33. Fortunately, Petersen qualified and received a liver transplant on April 7, 2024. He continues to recover and recuperate, but the transplant left him hospitalized from approximately Thanksgiving 2023 until approximately July 2024.

33. Despite the success, Petersen is regularly hospitalized for extended periods of time due to complications resulting from his liver transplant.

**Ransomware Attack and X-Caliber's Default**

34. In and around October 2023 while Petersen was hospitalized, PHC and some of its facilities fell victim to a ransomware attack that prevented it from utilizing its billing and computer systems.

35. X-Caliber made no effort to help PHC resolve its logistical setbacks or financial difficulties caused by the ransomware attack, nor did they alleviate any of the Loan Agreement's payment requirements in light of PHC's daunting situation.

36. Despite great efforts by PHC and its employees to function under such extreme conditions, X-Caliber took advantage of the attack (and Petersen's hospitalization) to declare an Event of Default on December 29, 2023 (the "Default Notice"), pursuant to sections 5.37 and 6.2 of the Loan Agreement, and accelerated the debt to the amount of "[sic] $34,486,93.91."

37. Section 5.37 of the Loan Agreement addresses compliance with Health Information Laws, which are broad, intricate, complicated and will necessarily be impacted by a ransomware attack. *See, e.g.* Section 5.37(a) (requiring the Borrowers to be "in compliance with all applicable statutes, laws, ordinances, rules and regulations of any federal, state or local government authority

with respect to regulatory matters…"). X-Caliber did not indicate in its Default Notice how PHC violated Section 5.37 of the Loan Agreement.

38. Section 6.2 of the Loan Agreement addresses the need to provide X-Caliber with prompt written notice of certain material events, none of which expressly include a ransomware attack or other security issues.

39. Notably, neither of these sections address any failure to make payments to X-Caliber pursuant to the Loan Agreement because PHC complied with all such obligations during this time.

40. Despite the tumultuous events affecting PHC and the Facilities, the Borrowers still prioritized its obligations under the Loan. On December 29, 2023, the Borrowers made a $4.5 million payment to X-Caliber to paydown the Loan. Notably, X-Caliber waited to receive this payment before issuing the Default Notice later that very day.

**Appointment of a Receiver and Walnut Creek Management**

41. On January 23, 2024, X-Caliber filed a foreclosure action in the Northern District of Illinois against the Borrowers, in the case captioned *X-Caliber Funding LLC et al. v. El Paso HCC, LLC et al.*, Case No. 3:24-cv-50034 ("Rockford Matter").

42. Simultaneously, in the Rockford Matter, X-Caliber also filed an emergency motion for the appointment of a receiver over the Facilities.

43. X-Caliber's justification for the appointment of a receiver was that, among other things, a receiver would: (a) "stabilize the situation," (b) "assure creditors," and "carry out an organized sale of Defendants' assets that…creates recoveries for Defendants' creditors."

44. X-Caliber repeatedly stated that the purpose of the receiver was to place the Facilities "in the best position to preserve and maximize the remaining value of…[the] assets for

53154582.3

the benefit of [ ] creditors." To keep the Facilities under the care of PHC "would be catastrophic for creditors."

45. In the motion for a receiver, X-Caliber proposed the appointment of Michael F. Flanagan of Flanagan & Associates, L.L.C. (the "Receiver" or "Flanagan").

46. On January 25, 2024, at a hearing before the Honorable Iain D. Johnston regarding X-Caliber's emergency motion for the appointment of a receiver, counsel for X-Caliber stated that X-Caliber would "fund the shortfalls on these facilities until they can be stabilized and sold." This statement was false.

47. Additionally, the Court was also informed that Flanagan would select Joseph Tutera ("Tutera") and his management company, Walnut Creek, to manage the Facilities on behalf of the Receiver and "stabilize the situation…and/or have secured long term solutions."

48. Upon information and belief, Tutera and Flanagan are very close personally, and often work together on Flanagan's receiverships. In fact, Flanagan & Associates, L.L.C., is located at 7611 State Line Road, Kansas City, Missouri in Suite 303, and Tutera Senior Living is also located at the same address but at Suite 301.

49. Tutera owns, operates and manages approximately 70 assisted living facilities in the Midwest, including ten (10) in the State of Illinois which are in direct competition with many PHC facilities. Tutera used to be the largest operator in the State of Illinois for health care facilities and, in fact, sold several such facilities to Petersen in the 1990s.

50. Tutera was also previously accused of accepting millions of dollars in kickbacks from a seller of durable medical equipment and supplies. In *United States ex rel. Bogina v. Medline Industries, Inc.*, Case No. 11-c-05373, 2015 WL 1396190 (N.D.Ill. Mar. 24, 2015) ("Bogina

53154582.3

Matter"), Tutera and Walnut Creek were accused of accepting millions of dollars in kickbacks and bribes if it purchased the durable medical equipment from Medline Industries, Inc. ("Medline").

51. The Bogina Matter was a qui tam litigation brought by August Bogina, as relator on behalf of the United States and eleven (11) individual states. While the Bogina Matter dismissed claims against Tutera based on procedural and technical defects, the allegations against Tutera and Walnut Creek are specific, disturbing and consistent with a previous qui tam action against Medline in *United States ex rel. Mason v. Medline Indus. Inc.*, Case No. 07-C-5615.

52. On January 25, 2024, the court in the Rockford Matter appointed the Receiver, and Walnut Creek and Tutera began managing the Facilities.

53. There is no evidence that Walnut Creek or the Receiver or X-Caliber has made any attempts to sell the Facilities since the Receiver's appointment. Despite promising the Hon. Johnston that the intent was to maintain the Facilities' values for their sale, no real estate broker has been hired to advertise or attempt to sell the Facilities.

54. By contrast, virtually all of the facilities that were previously owned by PHC but were subject to the Bankruptcy Court for the District of Delaware have already been sold.

55. Rather, X-Caliber and Walnut Creek have pursued their scheme of running the Facilities into the ground. Admittedly, a spokesman for X-Caliber stated that its goal is an "optimal outcome for our stakeholders and investors," whatever form that may come in.

**Tutera and Walnut Creek's Management Devalues The Facilities**

56. Though X-Caliber told the court in the Rockford Matter that it would cover any shortfalls of the Facilities, in part, to maintain their value, X-Caliber and/or Walnut Creek immediately stopped making any interest payments or payments on taxes and insurance upon its appointment, thereby causing the amount owed to X-Caliber to increase dramatically.

53154582.3

57. By contrast, the Borrowers made consistent payments since November 2019 on the Loan and payments towards taxes and insurance, which slowly decreased the amount owed on the Loan.

58. Upon information and belief, X-Caliber and Walnut Creek intentionally stopped payments to increase the total amount Petersen would be liable for on the Guaranty.

59. Moreover, oversight and accountability of Tutera and Walnut Creek is now limited since, as noted in a Court filing, Tutera and Walnut Creek "moved billing, payroll and all operational management from the Petersen centralized management to management by his own new manager."

60. Aside from periodic reports that the Receiver issues to the court in the Rockford Matter, which merely show a monthly financial statement, there is little to no oversight or questioning of Walnut Creek and Tutera's actions.

61. Even in reviewing the reports issued by the Receiver in the Rockford Matter, it is clear that the number of residents—or, the census—living at some of the Facilities is dropping precipitously. The Receiver's Fifth and Sixth Reports show that the total facility census for Polo HCO, LLC ("Polo") has dropped from 23.66 to 18 in only eight months. Likewise, Legacy HCO, LLC's census has dropped from 44 to 36.97, and El Paso HCO, LLC's ("El Paso") census dropped from 110.93 to approximately 94 over the same time period.

62. Upon information and belief, Walnut Creek and Tutera instituted new policies that are intended to decrease the populations at the Facilities, thereby driving down their profitability and value. For instance, Walnut Creek and Tutera now require potential new patients reliant on Medicaid to be approved for Medicaid before being admitted into the Facilities. Many patients,

53154582.3

however, particularly low-income individuals reliant on government aid, have tremendous difficulty completing the necessary applications and paperwork for Medicaid assistance.

63. Previously, PHC would admit Medicaid-qualified patients and assist them in completing the necessary applications for Medicaid. Walnut Creek and Tutera's change in policy precludes many low-income seniors from accessing the Facilities, resulting in the drop in census and revenues. More importantly, it is a disservice to low-income seniors in need of assisted living facilities.

64. Additionally, neither Walnut Creek nor Tutera have sufficient (if any) experience managing assisted living facilities with a prominent mental health treatment center, which is the case in El Paso. Many of the mental health residents there are considered "hard to place," which means there are very few facilities that have the capability of addressing their complex and difficult mental health issues. Treatment requires pragmatic and eclectic approaches from qualified medical providers—requirements Tutera and Walnut Creek do not have the capabilities or experience to address. As a result, El Paso's census has decreased as mental health residents need to seek care elsewhere, and Walnut Creek are not accepting new residents because of their lack of capabilities.

65. As a result, at El Paso, revenues have decreased over the past eight (8) months from $667,854 to $507,105. Despite the drop in census, the total operating expenses have inexplicably ballooned from $101,186 to $832,803 and, at one point, were as high as $854,998. As a result, El Paso's net income has plummeted from earning $566,668 in January 2024 to losing $325,699 (-$325,699) in only approximately eight months.

66. Similarly, Polo's revenue has also decreased from $203,406 to $123,794 during the same seven-month period and, like El Paso, its operating expenses have also significantly

53154582.3

increased from $216,102 to $267,879 and, at one point, were as high as $280,464. It is inexplicable why operating costs have increased so significantly, when the total population of residents has decreased substantially during the same time period.

67. The same is true for almost all of the Facilities under Walnut Creek and Tutera's management: CYE Kewanee HCO, LLC went from a $7,955 net income in February 2024 to losing $5,193 by August 2024; Flanagan HCO, LLC earned $214,319 in January 2024, but lost $88,448 in August 2024; Marigold HCO, LLC earned $469,763 in January 2024, but lost $145,515 in August 2024.

68. Prior to the installation of Walnut Creek and Tutera, these Facilities were successful assisted living facilities.

69. Tutera has also begun to personally "poach" key employees and staff away from PHC and the Facilities, and work at Tutera's own facilities, in order to further undermine the success and capabilities of the Facilities. Tutera's intent to take over the Facilities for his own, as described more fully below, is evident since he told at least one regional staff member that they should leave PHC for Tutera's facilities because "you are going to be working for us anyway."

**Receiver's Intent to Close El Paso and Polo**

70. On October 8, 2024, the Receiver informed counsel that he intended to close Polo and El Paso because Polo had an expensive boiler system issue, and El Paso was deemed unprofitable. Both of these meritless justifications only cements Walnut Creek and Tutera's intent to devalue the Facilities for the benefit of Tutera and X-Caliber.

71. First, the Receiver stated that due to a boiler system issue at Polo that allegedly "needs significant mechanical repairs and/or replacement in order to be able to work and heat the

53154582.3

building properly," he was going to implement an "emergency evacuation" of residents and relocate the majority of them to other Tutera-owned facilities in Dixon, Illinois.

72. The Receiver's justification for the "temporary closure" was that he learned, upon information and belief, from Walnut Creek that repairing or replacing the boiler plate system at Polo would cost "at least" $250,000, and there are "not funds to use to address this issue."

73. The Receiver provided no proposal or estimate to support the extraordinary cost.

74. This pretextual justification for closing Polo (and moving residents to Tutera-owned facilities) is obvious since X-Caliber pledged to the court in the Rockford Matter that it would "fund the shortfalls on these facilities until they can be stabilized and sold." X-Caliber should be funding this repair.

75. The Receiver also announced that the "operating losses at El Paso are huge…with no end in sight" and therefore he determined that "El Paso cannot operate as a viable business entity." Accordingly, the Receiver stated he would request permission from the Court to seek closure from the Illinois Department of Public Health and relocate the majority of residents to "other facilities located through the State of Illinois" – no doubt, to many Tutera-owned facilities.

76. The closing of El Paso is particularly egregious, and most clearly shows Walnut Creek and X-Caliber's scheme to devalue the properties, because Walnut Creek and Tutera turned a profitable, successful assisted living facility into a financial failure, as shown above. El Paso was one of PHC's most successful assisted living facilities, and now, under Tutera's management, it cannot keep its doors open.

77. The result of Tutera and Walnut Creek's mismanagement of these facilities is that their value has plummeted and they are now no longer eligible or likely to receive HUD approval.

53154582.3

**X-Caliber Assigned The Debt To IDAC But Kept The Claim Against Petersen**

78. On October 11, 2024, X-Caliber assigned all debt and accompanying loan documents to Illinois Debt Acquisition Company, L.L.C.

79. IDAC is a Missouri limited liability company that was organized by Tutera on or about October 11, 2024.

80. IDAC's Articles of Organization ("Articles") were filed on the same day the debt was assigned to it from X-Caliber. Under the Articles, the Receiver is listed as IDAC's registered agent while Tutera is the sole organizer listed. Flanagan is also listed as the individual the filed Articles should be addressed and returned to.

81. On October 14, 2024, however, IDAC assigned back to X-Caliber its claims against Petersen under the Guaranty in this Matter.

82. As a result, Tutera, who utilized Walnut Creek to devalue the Facilities, can now foreclose on those properties and either keep them under IDAC or sell them at discount rates to other Tutera-entities. Moreover, X-Caliber maintains its Guaranty claims against Petersen for an ever-growing amount, as the Facilities continue to be devalued by Tutera. The result is grossly unjust.

**FIRST CAUSE OF ACTION**
**(Breach of the Covenant of Good Faith and Fair Dealing against X-Caliber)**

83. Defendant realleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

84. As described above, X-Caliber schemed with Tutera's entities, namely Walnut Creek and IDAC, to take actions that decreased the value of the collateral securing the Loan in order to increase the total exposure of Petersen to X-Caliber under the personal guarantee.

53154582.3

85. The implied covenant of good faith and fair dealing between parties to a contract embraces a pledge that neither party shall do anything which will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract.

86. By taking said actions solely for its personal gain, X-Caliber prevented Petersen from receiving the benefit of his bargained-for exchange under the personal guarantee, thereby breaching the implied covenant of good faith and fair dealing.

87. As a result, Petersen has been damaged in an amount to be proved at trial.

## SECOND CAUSE OF ACTION
### (Prima Facie Tort Against Walnut Creek and IDAC)

88. Defendant realleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

89. The actions of Walnut Creek and IDAC described above were intentional, malicious and solely taken to injure Petersen and to impede Petersen's rights without any excuse or justification.

90. As a direct and proximate result of the foregoing conduct, Petersen has been injured and caused to sustain substantial financial loss.

91. By reason of the foregoing, Petersen is entitled to compensatory and punitive damages in amounts to be proved at trial.

## THIRD CAUSE OF ACTION
### (Alter Ego Liability and Disregard of the Corporate Form Against Third-Party Defendants)

92. Defendant realleges and incorporates by reference the preceding paragraphs as if set forth fully herein.

93. At all relevant time, IDAC and Walnut Creek were mere instrumentalities of Third-Party Defendant Tutera and functioned as his alter egos.

94. Tutera is personally behind and is the organizer of IDAC and Walnut Creek, both of which operate under the domination and control of Tutera. Upon information and belief, each of these companies has overlapping officers and directors and is subject to the pervasive and complete control of Tutera.

95. Upon information and belief, under Tutera's dominance, IDAC and Walnut Creek lack sufficient capitalization for the nature of their business.

96. Under Tutera's dominance, Walnut Creek and IDAC ignore corporate formalities, as illustrated by the fact that IDAC was created the very same day X-Caliber assigned all of the debt owed under the Loan, and then assigned back to X-Caliber the right to pursue Petersen's personal guaranty without complying with any formalities.

97. Additionally, Tutera improperly created and utilized IDAC to acquire the amount owed under the Loan Agreement to avoid an obvious conflict of interest if his other dominated company, Walnut Creek, was the assignee since it currently manages the property under the Receiver. Neither IDAC nor the Receiver disclosed in the Rockford Matter that Tutera controls IDAC.

98. Tutera utilized IDAC and Walnut Creek with the intent to injure Petersen, as described herein.

99. Therefore, Tutera is liable for the full amount of the judgment against IDAC and Walnut Creek in an amount to be proved at trial.

53154582.3

**PRAYER FOR RELIEF**

**WHEREFORE**, Petersen prays for the following relief against X-Caliber, Tutera, IDAC and Walnut Creek:

(1) For compensatory and punitive damages against X-Caliber, Tutera, IDAC and Walnut Creek in an amount to be determined at trial, together with interest, costs, and attorney's fees;

(2) Such other and different relief as this Court deems just and proper.

Dated: New York, New York
October 23, 2024

**SAUL EWING LLP**

By: /s/ *Michael S. O'Reilly*
Michael S. O'Reilly, Esq.
Marshall O. Dworkin, Esq.
1270 Avenue of the Americas
New York, New York 10020
Tel.: (212) 980-7200
michael.oreilly@saul.com
marshall.dworkin@saul.com
*Attorneys for Defendant/Third-Party Plaintiff Mark B. Petersen*

53154582.3