**UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION**

| | |
|---|---|
| X-CALIBER FUNDING LLC, | |
| Plaintiff/Counter-Plaintiff, | |
| v. | Case No. 3:26-cv-50016 |
| MARK B. PETERSEN | Honorable Iain D. Johnston |
| Defendant/Counter-Plaintiff/ Third-Party Plaintiff, | |
| v. | |
| JOSEPH C. TUTERA, *et al.,* | |
| Third-Party Defendants | |

**MEMORANDUM OPINION AND ORDER**

The Court is intimately familiar with the circumstances that led to this litigation. *See Ill. Debt Acquisition Co., LLC v. El Paso HCC, LLC, et al.*, No. 24-cv-50034 (N.D. Ill. filed Jan. 23, 2024) (the "Receivership Action"). X-Caliber filed *this* action in the Supreme Court of the State of New York, County of New York on June 11, 2024. Dkt. 1. Defendant Mark Petersen removed the action to the Southern District of New York, where it languished for about a year and half—contrary to the spirit of the Civil Justice Reform Act of 1990—before it was transferred to the Northern District of Illinois. Now before the Court, two years after the action was first filed, is X-Caliber Funding LLC's motion to strike Petersen's affirmative

1

defenses [86], X-Caliber's motion to strike Petersen's jury demand and dismiss his counterclaims [87], and Third-Party Defendants Joseph Tutera, Walnut Creek Management, L.L.C., and Illinois Debt Acquisition Company, L.L.C.'s, motion to dismiss the third-party complaint and strike the jury demand [88]. For the reasons that follow, the motions are granted in part and denied in part.

## I.     Background[1]

X-Caliber's complaint tells a very short story. Petersen's complaint tells a significantly longer, slightly overlapping story. The following allegations are taken from Petersen's complaint and taken as true for the purpose of deciding the motions to dismiss. *Cincinnati Life Ins. Co. v. Beyrer*, 722 F.3d 939, 946 (7th Cir. 2013); *Cozzi Iron & Metal, Inc. v. U.S. Off. Equip., Inc.*, 250 F.3d 570, 574 (7th Cir. 2001) (applying motion to dismiss standard to a motion to dismiss a counterclaim).[2]

Petersen became the Chief Executive Officer of Petersen Health Care ("PHC") in 2002, taking over a company founded in 1974 by his father and uncle. Dkt. 82 at ¶¶ 13-17. The company operated over 90 nursing homes throughout the Midwest with annual revenues exceeding $339.7 million. *Id.* at ¶18. On October 31, 2019, ten PHC nursing facilities and their respective operating companies (the "PHC Facilities") entered into a $40,000,000 Loan Agreement with X-Caliber. *Id.* at ¶19.

---

[1] The paragraph numbers cited here refer to Petersen's countercomplaint against X-Caliber. The countercomplaint against the Third-Party Defendants appears to be identical except for the inclusion of additional defendants.

[2] As discussed below, X-Caliber's motion to strike Petersen's affirmative defenses is not necessarily subject to this standard.

Petersen personally guaranteed the loan, at least in part because he believed that the value of the facilities was greater than the value of the loan. *Id.* at ¶26.

Between 2019 and 2023, both parties apparently held up their end of the bargain. Things started to go south in late 2023. Petersen was hospitalized between November 2023 and July 2024 due to liver cirrhosis. *Id.* at ¶¶27-29. Around the same time, in October 2023, PHC fell victim to a ransomware attack. *Id.* at ¶31. X-Caliber subsequently declared an Event of Default under Sections 5.37 and 6.2 of the Loan Agreement on December 29, 2023, the same day PHC made a $4.5 million payment to X-Caliber. *Id.* at ¶¶33, 37. Section 5.37 of the Loan Agreement requires PHC to comply with applicable laws and government regulations. *Id.* at ¶34. Section 6.2 requires PHC to provide X-Caliber with prompt notice of material events—but doesn't expressly identify ransomware attacks as material. *Id.* at ¶35.

In January 2024, X-Caliber filed the Receivership Action in this Court and sought the appointment of a receiver, Michael F. Flanagan. *Id.* at ¶¶38, 39, 42. X-Caliber's counsel told this Court that X-Caliber would "fund the shortfalls on these facilities until they can be stabilized and sold." *Id.* at ¶43. The Court appointed Flanagan as the receiver on January 25, 2024. *Id.* at ¶49. Flanagan selected Tutera and his management company, Walnut Creek, to manage the PHC Facilities. *Id.* at ¶44. Tutera and Flanagan regularly work on receiverships together. *Id.* at ¶45. Tutera himself owns and operates ten assisted living facilities in Illinois, in direct competition with PHC. *Id.* at ¶46. On March 20, 2024, PHC declared bankruptcy. *Id.* at ¶50. X-Caliber and Flanagan initially agreed to market the PHC Facilities in

the bankruptcy sale, but they ultimately withdrew from the sale and elected to instead continue operating the PHC Facilities themselves. *Id.* at ¶¶51-56.

After Walnut Creek began managing the PHC Facilities, it stopped making payments on interest, taxes, or insurance, intentionally increasing the amount owed to X-Caliber. *Id.* at ¶¶58-59. According to a census, the number of residents living at the PHC Facilities dropped under Walnut Creek's management: at the Polo Facility the census dropped from 23.66 to 18; the Legacy Facility census dropped from 44 to 36.97; the Elso Paso Facility census dropped from 110.93 to 94.[3] *Id.* at ¶62.

Further devaluing the properties, Walnut Creek and Tutera implemented new policies that required patients to be approved for Medicare before they were admitted to PHC Facilities. *Id.* at ¶63. As expected, this reduced admissions to the Facilities. *Id.* Walnut Creek and Tutera lacked experience managing assisted living facilities with mental health treatment centers, like the El Paso Facility, resulting in a further exodus of residents. *Id.* at ¶65. Revenue declined at some facilities while expenses increased. Between February 2024 and October 2024, revenues at El Paso dropped from $667,854 to $507,105; operating expenses increased from $101,186 to $832,803. *Id.* at ¶66. And Polo's revenues decreased from $203,406 to $123,794 while expenses increased from $216,102 to $267,879. *Id.* at ¶67. Several other facilities, in the black when run by PHC, started losing money under Tutera and Walnut Creek's management. *Id.* at ¶68. Throughout 2024, Tutera hired away

---

[3] The Court isn't sure how a census can record the existence of less than a whole person, but these are the numbers provided in the complaint.

4

some PHC employees and told another PHC employee "you are going to be working for us anyway." *Id.* at ¶70.

On October 8, 2024, Flanagan informed unnamed counsel, presumably Petersen's, that he intended to close El Paso because it was unprofitable and close Polo because of a boiler problem. *Id.* at ¶71. Flanagan intended to relocate Polo residents to a Tutera run facility. *Id.* at ¶72. Flanagan estimated that it would cost at least $250,000 to repair the boiler but provided no support for this claim. *Id.* at ¶¶73-74.

X-Caliber assigned all of the PHC Facilities' debt to Illinois Debt Acquisition Company, L.L.C., a Missouri LLC organized by Tutera. *Id.* at ¶¶79-80. The company was organized on the same day as the debt assignment; Flanagan is listed as the registered agent and Tutera is the sole organizer. *Id.* at ¶81. On October 14, 2024, Illinois Debt Acquisition Company, L.L.C. assigned back to X-Caliber the claims against Petersen under the Guaranty. *Id.* at ¶82.

From this, Petersen brings claims for breach of the covenant of good faith and fair dealing and civil conspiracy against X-Caliber. He further brings claims for civil conspiracy and disregard for the corporate form against the Third-Party Defendants.

5

### III.  X-Caliber's Motion to Strike Affirmative Defenses

X-Caliber moves to strike Petersen's five affirmative defenses, which allege: (1) Improper Venue; (2) Failure to Mitigate; (3) Champerty; (4) Standing; and (5) *In Pari Delicto*.[4]

Rule 12(f) gives a court the *discretionary* ability to strike an insufficient affirmative defense. Fed. R. Civ. P. 12(f). Motions to strike are strongly disfavored as they are often a waste of the court's time. *Custom Vehicles, Inc. v. Forest River, Inc.*, 464 F.3d 725, 727 (7th Cir. 2006) (Easterbrook, J., in chambers); *Stoicescu v.*, 24-cv-50018 2025 U.S. Dist. LEXIS 56181, at *3. But "when striking portions of a pleading removes unnecessary clutter from the case, the motion may serve to expedite, not delay." *Sarkis' Cafe, Inc. v. Sarks in the Park, LLC*, 55 F. Supp. 3d 1034, 1039 (N.D. Ill. 2014) (cleaned up).

The Seventh Circuit hasn't decided whether the *Twombly*/*Iqbal* standard applies to affirmative defenses or if the defendant has a lesser burden. *Id.* at 1040. Many district courts in the circuit have concluded that the *Twombly*/*Iqbal* standard applies. *Id.* (collecting cases). But more recently, district courts in the Northern District of Illinois have become increasingly critical of this stance. *Aylin & Ramtin, LLC v. Barnhardt*, No. 19-cv-3402, 2022 U.S. Dist. LEXIS 38755, at *5-8 (N.D. Ill. Mar. 4, 2022) (holding that an affirmative defense is sufficient if it gives the plaintiff "fair notice of the nature of the defense") (internal quotation omitted); *RBG*

---

[4] At least two of these "affirmative defenses" are not truly affirmative defenses: improper venue and standing. *See Stoicescu v. Hamilton Sundstrand Corp.*, 24-cv-50018 2025 U.S. Dist. LEXIS 56181, at *3 (N.D. Ill. Mar. 26, 2025) (defining affirmative defenses).

*Plastic, LLC v. Webstaurant Store,* No. 1:18-CV-05192, 2020 LEXIS 222460, at \*13 (N.D. Ill. Nov. 29, 2020) (same).

The Court doesn't need to decide the issue today because Petersen's affirmative defenses are insufficient under either standard. Petersen's affirmative defenses don't include any references to any facts. Petersen's responsive argument—that the facts alleged elsewhere in the pleading provide a basis for his affirmative defenses—doesn't work. *Sarkis' Cafe,* 55 F. Supp. 3d at 1040 n.3 (noting that "pleadings cannot be amended by a party's brief in opposition to a motion to dismiss."). Labels might provide some help at the grocery store, but they don't tell an opposing party what supports a claim in federal court. There's no fair notice here.

The motion to strike the affirmative defenses will be granted without prejudice. Petersen is free to replead the affirmative defenses incorporating appropriate facts. He should be careful to assert only *viable* defenses. Likewise, X-Caliber shouldn't take the decision to grant this motion as a sign that the Court will look kindly upon future motions to strike. There are better ways of dealing with affirmative defenses. *Aylin & Ramtin,* 2022 U.S. Dist. LEXIS 38755, at \*7.

## IV.    Motion to Dismiss Legal Standard

A motion to dismiss a complaint brought under Rule 12(b)(6) challenges the sufficiency of a complaint. To defeat a motion to dismiss, the plaintiff must have alleged enough facts to "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 570 (2007). A plaintiff's well-pleaded factual

allegations must allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). The Court accepts as true all of the plaintiff's well-pleaded allegations and views them in the light most favorable to the plaintiff. *Landmark Am. Ins. Co. v. Deerfield Constr., Inc.*, 933 F.3d 806, 809 (7th Cir. 2019). However, a court "may reject sheer speculation, bald assertions, and unsupported conclusory statements." *Taha v. Int'l Bhd. of Teamsters, Loc. 781*, 947 F.3d 464, 469 (7th Cir. 2020). The Court is also free to consider matters of public record such as public court documents. *Ennenga v. Starns*, 677 F.3d 766, 774 (7th Cir. 2012). The defendant has the burden of persuasion on a motion to dismiss. *Reyes v. City of Chicago*, 585 F. Supp. 2d 1010, 1017 (N.D. Ill. 2008).

"Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The complaint "must give enough details about the subject-matter of the case to present a story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). There must be "more than a sheer possibility that a defendant has acted unlawfully." *Iqbal*, 556 U.S. at 678. "But the proper question to ask is still '*could* these things have happened, not did they happen.'" *Carlson v. CSX Transp. Inc.*, 758 F.3d 819, 827 (7th Cir. 2014) (quoting *Swanson*, 614 F.3d at 404-05).

## VI.   X-Caliber's Motion to Dismiss

### a.  Count I – Breach of the Covenant of Good Faith and Fair Dealing

X-Caliber advances four separate arguments for dismissing Petersen's claim for breach of the implied covenant of good faith and fair dealing. The Court doesn't need to look beyond the first one.

X-Caliber argues that Petersen waived his right to bring the claim by signing the Guaranty. Inexplicably, Petersen responds by discussing compulsory counterclaims. The Guaranty is referenced throughout Petersen's complaint and attached to X-Caliber's motion to dismiss. Dkt. 87 ex. 1. So the Guaranty is considered part of the complaint and it may be considered in ruling on the motion to dismiss. *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002).

Petersen agreed "all sums payable to [X-Caliber] under this Guaranty shall be payable on demand and without reduction for any offset, claim, counterclaim or defense." He further agreed, "[t]he obligations of Guarantor hereunder shall be irrevocable, absolutely and unconditional, irrespective of …any setoff, counterclaim, and irrespective of any other circumstances which might otherwise limit recourse against Guarantor by Lendor or constitute a legal or equitable discharge or defense of a guarantor or surety." He also "expressly and irrevocably waive[d] all defenses in an action brought by [X-Caliber] to enforce this Guaranty based on claims of waiver, release, surrender, alteration or compromise and all setoffs, reductions, or impairments, whether arising hereunder or otherwise."

Under New York law,[5] guaranty agreements are understood according "to the ordinary principles of contract construction." *Cooperatieve Centrale Raiffeisen-Boerenleenbank, B.A. v. Navarro*, 36 N.E.3d 80, 85 (N.Y. 2015) (quoting *Compagnie Financiere de CIC et de L'Union Europeenne v Merrill Lynch, Pierce, Fenner & Smith Inc.*, 188 F.3d 31, 34 (2d Cir. 1999)). This means a guaranty "that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms." *Id.* (citation omitted). A court considering identical language held that that a guaranty prevented the defendants from using "any of the counterclaims they assert to escape liability." *Argentic Real Est. Inv. 2 LLC v. Haikins*, 820 F. Supp. 3d 278, 282, 284 (S.D.N.Y. 2025).

Petersen's argument about the compulsory counterclaim doesn't address X-Caliber's argument about the Guaranty. To the extent that he seeks to argue that the Guaranty can't waive his counterclaim because it's compulsory, that argument is both unsupported and unavailing. There is no "compulsory counterclaim" exception in the Guaranty, and it will be enforced according to its terms. *See Hitachi Constr. Mach. Co., Ltd v. Weld Holdco, LLC*, 23 Civ. 490 (NRB), 2023 U.S. Dist. LEXIS 217295, at *35-36 (S.D.N.Y. Dec. 6, 2023) (holding the same). Based on the broad language of the Guaranty and without the benefit of a relevant argument by Petersen, the Court will dismiss Petersen's claim for breach of the covenant of good faith and fair dealing.

---

[5] Section 10 of the Guaranty provides that it shall be governed and construed in accordance with New York law.

This dismissal will be without prejudice. But Petersen should only file an amended complaint if he has a colorable argument that the language of the Guaranty doesn't control his claim. *See* Fed. R. Civ. P. 11(b)(2).

### b. Count II – Civil Conspiracy

Petersen's claim for civil conspiracy isn't covered by the waiver. But it must be dismissed for lack of standing. Petersen has standing to allege a claim for breach of an implied covenant of the Guaranty because the harm he alleges, the breach of the contract, is personal to him. But "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek (for example, injunctive relief and damages)." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).

The distinction between direct injuries and derivative harms or generalized grievances is a familiar feature of the law. *See, e.g., Warth v. Seldin*, 422 U.S. 490, 502 (1975) (discussing the constitutional requirement of a personalized stake in the litigation); *In re Deere & Co. Repair Serv. Antitrust Litig.*, 703 F. Supp. 3d 862, 875 (N.D. Ill. 2023) (discussing the direct purchaser rule of *Ill. Brick Co. v. Illinois*, 431 U.S. 720 (1977)). In the corporate context, "a shareholder generally cannot sue for indirect harm he suffers as a result of an injury to the corporation." *Rawoof v. Texor Petroleum Co.*, 521 F.3d 750, 757 (7th Cir. 2008). This rule applies to guarantors as well.

In *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chi.*, a bank loaned money to a corporation and secured a guaranty from the corporation's two sole

11

shareholders. 877 F.2d 1333, 1335-37 (7th Cir. 1989). After the corporation collapsed, the guarantors joined the corporation's lawsuit against the bank. *Id.* at 1334. Following a thorough review of the distinction between direct and derivative injuries, the Seventh Circuit held that the guarantors had suffered only a derivative injury because their losses flowed from the losses suffered by the company. *Id.* at 1335 ("A blow costing [the corporation] $1 could not cost the [guarantors] more than $1. An award putting the $1 back in [the corporation's] treasury would restore the [guarantors] to their former position."). As a result, they didn't have standing. *Id.* at 1336 ("We know that creditors cannot recover directly for injury inflicted on a firm, so guarantors as potential creditors likewise cannot recover.").

The Seventh Circuit has reaffirmed this rule noting, "[g]uarantors, like creditors, suffer at most an injury derivative to the debtor. That is not enough to confer standing, especially when, as here, the guarantor does not allege that the guarantee personally cost him money (in this case, because the bank never enforced the guarantee)." *Scruggs v. Wauwatosa Sav. Bank*, 723 Fed. Appx. 349, 350 (7th Cir. 2018). X-Caliber seeks to enforce the Guaranty against Petersen, but the rule is the same. If a guarantor only suffers a derivative injury, he has no standing to bring a claim.

As it relates to the civil conspiracy claim, the only harm Petersen seems to allege is his increased liability under the Guaranty. See dkt. 96 at 12-13 ("X-Caliber fails to recognize that Petersen is alleging personal harm caused by X-Caliber, the increase of his Guaranty exposure due to the conspiracy."). That's a problem for

12

Petersen, because it's a derivative injury. Petersen's liability under the guaranty increased because the PHC Facilities were worth less. Petersen was harmed only insofar as the PHC Facilities were harmed. If the PHC Facilities had an extra dollar, Petersen would owe one less dollar. Petersen fails to allege any injury separate and distinct from any harm suffered by the PHC Facilities.

Strangely, Petersen argues—without support, by the way—that because the conspiracy and alter ego claims are not property claims, he possesses standing. But absent personal damage or injury, he lacks standing. Merely classifying his claims as non-property claims doesn't address the lack of personal damage or injury.

Petersen's lack of standing dooms his claim. However, the dismissal of this claim must be without prejudice. *White v. Illinois State Police*, 15 F.4th 801, 808 (7th Cir. 2021).

### c. The Motion to Strike the Jury Demand

X-Caliber also moves to strike Petersen's jury demand on the grounds that it was waived by the Guaranty. The Guaranty set forth—in all capital letters—that the Guarantor waived his jury trial rights: WAIVER OF TRIAL BY JURY. GUARANTOR HEREBY WAIVES THE RIGHT OF TRIAL BY JURY IN ANY LITIGATION, ACTION OR PROCEEDING ARISING HEREUNDER OR IN CONNECTION THEREWITH.

The Seventh Amendment to the Constitution protects the right to a jury trial in civil matters with an amount in controversy exceeding $20, but it can be waived by contract. U.S. Const., amend. VII; *IFC Credit Corp. v. United Bus. & Indus. Fed.*

13

*Credit Union*, 512 F.3d 989, 993 (7th Cir. 2008). Ordinary principles of contract law determine the effectiveness of the waiver. *Id.* at 991-92. The waiver must be knowing and voluntary. *Whirlpool Fin. Corp. v. Sevaux*, 866 F. Supp. 1102, 1106 (N.D. Ill. 1994). *Whirlpool* identified four factors for a court to consider including "(1) the parties' negotiations concerning the waiver provision, if any, (2) the conspicuousness of the provision, (3) the relative bargaining power of the parties and (4) whether the waiving party's counsel had an opportunity to review the agreement". *Id.*

Under standard Illinois contract principles and the factors considered in *Whirlpool*, it's appropriate to enforce the jury waiver. Petersen is a sophisticated party who had the opportunity to read the contract, review it with counsel, and negotiate (and renegotiate) it freely. The initial loan agreement was amended several times. Dkt. 82 at ¶19 n. 2. His suggestion that he had to sign the contract because the facilities needed the funding is not the type of unequal bargaining power that prevents the enforcement of a contract. *See Kewanee Prod. Credit Ass'n v. G. Larson & Sons Farms, Inc.*, 496 N.E.2d 531, 534 (Ill. App. Ct. 1986) ("[D]uress does not exist where consent to an agreement is secured because of hard bargaining positions or the pressure of financial circumstances."). On the facts alleged, there was no unequal bargaining power. Petersen could have sought funding elsewhere given his assertion "that the value of the Facilities were far greater than the Loan." Dkt 82 at ¶26. Petersen doesn't contest the validity of the Guaranty, and the jury

14

waiver is plainly a part of it. X-Caliber's motion to strike the jury demand is therefore granted.

## VII. Third-Party Defendants' Motions

### a. Motion to Dismiss

Petersen's claims against the Third-Party Defendants must be dismissed for the same reason as his civil conspiracy claim against X-Caliber. He lacks standing to assert a claim derivative entirely of the harm to the PHC Facilities. The only personal harm he asserts is increased liability as a guarantor. *See* dkt. 97 at 9 ("Petersen has adequately alleged . . . he suffered damages due to his increased liability under the Guaranty, not that some other property was damaged."). That's insufficient for standing purposes. *Mid-State Fertilizer Co.*, 877 F.2d at 1335-37. Because the dismissal is for lack of standing, the dismissal will be without prejudice.

### b. Jury Demand

Finally, the Third-Party Defendants obliquely moved to strike Petersen's jury demand. Petersen reasonably argued that the Third-Party Defendants failed to develop their argument. In any event, the motion to strike the jury demand is denied as moot because the Court granted the Third-Party Defendants' motion to dismiss for lack of subject matter jurisdiction.

## VIII. Conclusion

Petersen's affirmative defenses are struck. Both X-Caliber's and the Third-Party Defendants' motions to dismiss are granted. The dismissals will be without

prejudice. X-Caliber's motion to strike Petersen's jury demand is granted. The Third-Party Defendants' motion for the same is denied as moot. Petersen should only file a new complaint if he can overcome the deficiencies identified in this Opinion.

Entered: June 8, 2026                          By: _____
                                                    Iain D. Johnston
                                                    U.S. District Judge